UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| OTIS C.[1] | ) |
| | ) |
|        Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 3:21-cv-00099-GCS |
| | ) |
| COMMISSIONER of SOCIAL SECURITY, | ) |
| | ) |
|        Defendant. | ) |

MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff, through counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits.[2]

PROCEDURAL HISTORY

On January 11, 2019, and March 13, 2019, Plaintiff filed applications for DIB and SSI alleging a disability onset date of November 17, 2008. After holding an evidentiary hearing on July 9, 2020, an Administrative Law Judge ("ALJ") denied the application on August 18, 2020. On December 7, 2020, the Appeals Council denied Plaintiff's request for

---

[1]   Plaintiff's full name will not be used in this Memorandum & Order due to privacy concerns. *See* FED. R. CIV. PROC. 5.2(c) and the Advisory Committee Notes thereto.

[2]   This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). *See* (Doc. 10).

review, making the ALJ's decision the final agency decision subject to judicial review. (Tr. 60). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

### ISSUES RAISED BY PLAINTIFF

Plaintiff raises the following issues:

1. The ALJ exceeded her authority by inferring limitations from objective medical findings.

2. Opinion evidence was not properly considered.

3. The ALJ failed to properly evaluate Plaintiff's pain.

### APPLICABLE LEGAL STANDARDS

"The [SSA] provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151 (2019). Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018)(citing 42 U.S.C. § 423(d)(1)(A)).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20

C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *See Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154 (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## THE DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. She determined that Plaintiff met the insured status requirements through December 31, 2013, and that Plaintiff had not worked at the level of substantial gainful activity since his alleged onset date of November 17, 2008. The ALJ found that Plaintiff had the following severe impairments: transverse myelitis of the thoracic spine; mild degenerative disc disease/degenerative joint disease of the thoracic spine; mild degenerative disc disease and facet arthropathy of the lumbar spine; bilateral plantar calcaneal bone spurs; and moderate arterial disease of the posterior tibial artery. She also found that Plaintiff had the following non-severe impairments of right paranasal sinus disease, obesity, diabetes, and depression. (Tr. 60-63).

The ALJ found that Plaintiff had the residual functional capacity ("RFC") "to perform sedentary work except the claimant cannot climb ladders, ropes, or scaffolds and can only occasionally climb ramps and stairs. He can engage in no more than occasional balancing, stooping, kneeling, crouching, and crawling and cannot work at unprotected heights, around moving mechanical parts or other such hazards. The claimant can have no concentrated exposure to heat." (Tr. 66). Thus, the ALJ found Plaintiff was not disabled.

## THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum & Order. The following summary of the record is directed to the points raised by Plaintiff.

    **1.**    **Evidentiary Hearing**

Plaintiff was represented by an attorney at the telephone hearing on July 9, 2020. During the hearing, Plaintiff and the vocational expert ("VE"), Darrell W. Taylor, Ph.D, testified. (Tr. 60).

Plaintiff testified that he lives with his wife and his two teenage children. (Tr. 92). From 2005 to 2008, Plaintiff worked as an auto technician/motor mechanic. (Tr. 90-91).

Plaintiff testified that he had a work injury wherein his lower back popped. The area was the T5 vertebra of his spinal cord. (Tr. 93-94). In 2006, Plaintiff was diagnosed with transverse myelitis after having an MRI. (Tr. 91, 93). Plaintiff has tried medications, steroid treatment, and a couple rounds of physical therapy. (Tr. 94).

Plaintiff experiences dull achy pain from his mid to lower back that wraps halfway around his rib cage, and he develops radiating pain down through his leg, into his joints, knees, ankles, and feet. He also has nerve damage in his back because of the transverse myelitis. (Tr. 93). He has constant tingling and numbness due to the transverse myelitis from his T5 or T6 vertebra down to his toes. (Tr. 94). His pain level is always about a five or six, and the pain is always present. Two days a week the pain "gets pretty intolerable" and he must lay down, raise his feet, and take ibuprofen. (Tr. 95). Plaintiff stated that elevating his feet helps relieve the pain for a little while. (Tr. 95).

Plaintiff also testified that if he sits more than 45 minutes the pain becomes sharp in his lower back from being compressed and from his legs being still. He stated that he will also have cramps and muscle spasms, so he must reposition his legs. After 45 minutes to an hour of sitting, Plaintiff will walk around for 10 to 20 minutes. (Tr. 96). Plaintiff can

stand for about an hour and a half, but during this time, he moves back and forth from foot to foot and changes positions. Plaintiff tries not to walk too long as he fatigues easily. (Tr. 97). The last family outing, Plaintiff walked three blocks and had to stop and rest. (Tr. 97).

Plaintiff takes his daughters grocery shopping; they help him lift anything too heavy. (Tr. 97). Sometimes during a shopping trip, Plaintiff will take a break after walking halfway around the store. (Tr. 98). The girls will then finish up the shopping, and he will meet them in the front of the store and pay. *Id.* In the past, Plaintiff has had to leave the store and sit in the car because of the pain. *Id.*

Plaintiff can lift ten to twenty pounds if he is standing still. (Tr. 99). He can lift something and place it on a shelf that is waist high. He can pick up a case of soda and place it in the cart if he does not have to walk with it. He cannot bend over and grab something heavy from a bottom shelf. (Tr. 99). If he bends more than 45 degrees, he feels like he will fall because his legs are weak. (Tr. 99-100).

As for chores, Plaintiff can perform "light duty stuff" around the house. He can sweep the kitchen and wipe the counters. (Tr. 101). He holds the broom in one hand, holds the counter with other hand, and leans on the counter. He can wash a few dishes and load them in the top of the dishwasher, and his girls load the bottom of the dishwasher. He cannot carry anything up or down the stairs. (Tr. 101). He needs to use both hands to go up and down the stairs as his balance is not good, and sometimes his knee will give out. (Tr. 102).

Even thought not prescribed, Plaintiff will occasionally use a cane if he is going to

be walking for long periods of time. (Tr. 102). He can lean on the cane if he needs to rest when there is no available place to sit, and he sometimes uses the cane to walk. At the store, he will just use the cart, but he does take the cane with him.

Four or five days out of the month the pain is worse than normal. On those days, he cannot get comfortable, and he is essentially "down for the day." (Tr. 103-104). He also tries to move around the house to get comfortable and will sit in the motorized recliner to try to relieve the pressure. He additionally lays on the couch and in the bed with his feet elevated on pillows and takes medications. (Tr. 104). The pain Plaintiff experiences on these days will affect his concentration. *Id.*

Plaintiff believes the pain medications affect his short-term memory. (Tr. 105). He takes a written list to the grocery store, and he writes down his appointments or he will forget his appointments or what is on his grocery list. *Id.*

Sometimes, Plaintiff experiences muscle spasms in his legs and in his lower back. (Tr. 105).

A couple nights a week, the pain will affect Plaintiff's sleep. After a nightly episode with pain, Plaintiff is really tired and fatigues easily; he also takes a nap during the day. (Tr. 107). His naps usually last one to two hours. Every day, he will lay down to rest after lunch for pain relief. (Tr. 107). Some days, he just sits on the couch. (Tr. 109).

Lastly, Plaintiff testified that the condition of his nerves has affected his bowel movements and bladder. (Tr. 110). There are times, for example (though not all the time), where he does not make it to the restroom. *Id.*

Next, the VE, Dr. Taylor, testified. Dr. Taylor classified Plaintiff's past work as

follows: "automobile mechanic. The DOT is 620.261-010. Medium exertional, skilled, SVP 7." (Tr. 113). Dr. Taylor testified that a hypothetical individual, who was the same age as Plaintiff and had the same education and past work consistent with what was described for the Plaintiff, could not perform the Plaintiff's past work. (Tr. 113-114). Dr. Taylor noted, however, that this hypothetical individual could perform other jobs. (Tr. 114). Specifically, such an individual could work as a hand packer, production worker, or inspector server (all unskilled, sedentary), and such jobs did exist in significant numbers in the national economy. (Tr. 114). Nevertheless, Dr. Taylor testified that competitive work does not exist if an individual required alternating between sitting and standing every 30 minutes or less. (Tr. 114). Similarly, Dr. Taylor testified that competitive work does not exist if an individual was off task 20 percent of the workday or off two or more days per month. (Tr. 114-115). Dr. Taylor also testified that "any unscheduled breaks outside of a 15-minute break in the morning or afternoon, 30 to 45 minutes lunch break would not be acceptable and would result in termination after a period of time." (Tr. 115). Lastly, Dr. Taylor testified that competitive work does not exist if an individual was required to prop his or her feet up. (Tr. 116).

2.      **Relevant Medical Records**

    a.      **Dr. Karna Sherwood**

On August 19, 2016, Plaintiff treated with neurologist, Karna Sherwood, for a neurology consult regarding complaints of difficulty walking and leg pain. Plaintiff reported difficulty walking since his previous diagnosis of transverse myelitis, progressive gait difficulties, muscle cramps, shooting pain in his legs, and soreness. He

also reported that he was getting weaker and had more difficulty walking and that in hot weather he was more fatigued. Sherwood's examination of Plaintiff revealed the following: (1) motor exam showed strength of 5/5 in all muscle groups both proximal and distal upper and lower extremities, no notable atrophy, and no pronator drift; (2) sensory exam indicated a decrease to pinprick at the T4 level with decreased vibration and light touch in the lower extremities bilaterally; (3) deep tendon reflexes were 3+ in the upper and lower extremities and plantars were upgoing bilaterally; (3) gait was abnormal with bend forward of the hips, decreased tandem gait and difficulty picking up the right foot with heel walking. Dr. Sherwood diagnosed Plaintiff with transverse myelitis. She ordered MRIs with contrast of the brain, C spine, and T spine and prescribed Mobic; she also wanted to evaluate for MS. (Tr. 365-367).

On October 21, 2016, Plaintiff returned to Dr. Sherwood for a follow-up visit. The MRIs of the brain and cervical spine were normal, while the MRI of the thoracic spine showed evidence of transverse myelitis. During his prior visit, Plaintiff was prescribed Baclofen and Gabapentin, both of which improved his shooting pains and muscle spasms. Plaintiff reported low back, knee, and ankle pain, which became worse with walking. Plaintiff also reported that the low back pain was as high as 8/10 in intensity. Further, Plaintiff did not notice any improvement with Mobic and asked about additional treatment options for his pain. The same exams were conducted and the findings showed no change from the original visit. Dr. Sherwood diagnosed Plaintiff with transverse myelitis, chronic bilateral low back pain without sciatica, and muscle spasms in both legs. She ordered an OSF pain referral and referred him to pain management to evaluate his

lower back pain. (Tr. 361-364).

On May 3, 2017, Plaintiff saw Dr. Sherwood for another follow-up visit. Plaintiff did note improvement with some of the burning pain in his feet with the use of Gabapentin. However, Plaintiff noted that his lower back pain was not adequately controlled; he also wanted to try something stronger than an anti-inflammatory. The same exams were conducted and the findings showed no change from the previous follow-up visit. Dr. Sherwood diagnosed Plaintiff with transverse myelitis, chronic bilateral low back pain without sciatica, and muscle spasms in both legs. She ordered Plaintiff to continue taking Gabapentin and prescribed Tramadol for his lower back pain. (Tr. 357-360).

Plaintiff returned to Dr. Sherwood for a follow-up visit on November 9, 2017. Again, Plaintiff noted improvements with some of the burning pain in his feet with the use of Gabapentin. However, he again noted that his lower back pain was not adequately controlled and that he wanted to try stronger medication. The same exams were conducted and the findings showed no change from the previous follow-up visit. Dr. Sherwood diagnosed Plaintiff with transverse myelitis and muscle spasms in both legs. She ordered Plaintiff to continue taking Gabapentin and Tramadol. (Tr. 353-356).

Six months later, Plaintiff saw Dr. Sherwood. He reported that his symptoms had modestly improved, and he was not having muscle spasms and shooting pain. However, he did note that he was having burning pain in his feet. He rated his pain as 6 to 7/10 in intensity. He stated that he was being judicious with the Tramadol, *i.e.*, he gets 10 pills at a time and saves them for when his symptoms are unbearable. The same exams were

conducted and the findings showed no change from the previous follow-up visit. Dr. Sherwood increased the Gabapentin and continued the Tramadol and Baclofen. (Tr. 349-352).

On January 17, 2019, Plaintiff treated with Dr. Sherwood for a follow-up. Plaintiff stated that he had significant discomfort in his legs, but his symptoms were largely stable. The same exams were conducted and the findings showed no change from the previous follow-up visit. Dr. Sherwood's diagnosis included transverse myelitis, ataxia, and chronic lower back pain without sciatica. (Tr. 373-374).

Plaintiff returned once again to Dr. Sherwood on August 8, 2019. He noted that his back pain was stable. He reported, however, having bad days, but he was able to tolerate it with his current regimen. The same exams were conducted and the findings showed no change from the previous follow-up visit. Dr. Sherwood's diagnosis included chronic back pain, transverse myelitis, and neuropathy. (Tr. 470-473).

On June 8, 2020, Plaintiff reported, via telephone, to Dr. Sherwood that he had significant low back pain and that he felt his symptoms were getting worse. He also reported significant muscle spasms. Dr. Sherwood referred him to pain management. (Tr. 502-503). As to Plaintiff's pain, Dr. Sherwood opined that it would result in the following restrictions:   would cause him to be off-task more than 20% of the workday; would allow him to sit for up to 30 minutes at a time for two hours per day and stand up to 45 minutes at a time for four hours per day; would need to get up to walk around every 15-30 minutes and would require position shifting at will; would need more than three unscheduled breaks per day; would need to elevate his legs with prolonged sitting, would sometimes

need a cane; could lift up to ten pounds; and would be absent two to three days per month. (Tr. 478-480).

      **b.**      **Dr. William R. Bartley, MD**

On January 30, 2018, Plaintiff treated with Dr. William R. Bartley for a follow-up visit regarding his diabetes. Plaintiff reported he was doing well and that he had transverse myelitis which neurology was treating. Dr. Bartley noted that Plaintiff was positive for arthralgias, back pain, and myalgias and positive for weakness and numbness; he also noted that Plaintiff had a slight waddling gait when ambulating. (Tr. 455-457).

On August 16, 2018, Plaintiff returned to Dr. Bartley for his annual exam. Plaintiff told Dr. Bartley that his transverse myelitis, depression, and diabetes were all doing very well. Dr. Bartley reported that Plaintiff was positive for weakness and numbness; Plaintiff also had an abnormal monofilament of his feet. Further, Dr. Bartley found Plaintiff's transverse myelitis to be stable. (Tr. 451-454).

On January 6, 2020, Plaintiff saw Dr. Bartley for a follow-up visit. Dr. Bartley noted that Plaintiff was doing well from the point of view that he had no deterioration of his health and that Plaintiff was doing better than three years prior when he had more pain and more limitations in his ability to walk. It was noted that Plaintiff occasionally took Tramadol, but it did not work well. Dr. Bartley reported that Plaintiff was positive for back pain and gait problems, that he was positive for numbness, and that Plaintiff had an abnormal monofilament of his feet. (Tr. 493-494).

### c. State Agency Consultants/Doctors

On May 7, 2019, Dr. M.W. DiFonso, PsyD, a state agency consultant, opined that Plaintiff had no severe mental impairment with mild limitations in each of the four B criteria. (Tr. 122-124). On July 21, 2019, Dr. Donna Hudspeth, PsyD, a state agency consultant, agreed with Dr. DiFonso's opinion. (Tr. 149-150).

On May 9, 2019, Dr. Lenore Gonzalez, state agency doctor, opined that Plaintiff could do light work with only occasional ramps, stairs, stooping, crouching, kneeling, and crawling, but could frequently balance and never climb ladders, ropes or scaffolds. (Tr. 125-127).

### d. November 20, 2020 EMG Nerve Conduction Results

The November 20, 2020 EMG revealed an abnormal study. It found generalized motor neuropathy affecting the axons of the motor nerves in both lower extremities. It also found no evidence of radiculopathy, myopathy, or focal nerve entrapment. (Tr. 25).

## ANALYSIS

The Court initially addresses Plaintiff's third argument that the ALJ failed to properly evaluate Plaintiff's pain. The Court agrees that the ALJ did not adequately explain her assessment of Plaintiff's subjective complaints. Specifically, the decision fails to explain why stable findings and no evidence of worsening is inconsistent with Plaintiff's subjective complaints. Based on the foregoing, the Court finds that remand is required for a proper evaluation of the Plaintiff's subjective symptoms.

The ALJ is "in the best position to determine a witness's truthfulness and forthrightness . . . [and thus, the] court will not overturn an ALJ's credibility

determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310–311 (7th Cir. 2012)(quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504–505 (7th Cir. 2004)). But, when the credibility determination rests on "objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). When making the credibility determination, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016)(superseding SSR 96-7p).[3] Additionally, while an ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence, reversal and remand is required where the ALJ "provides nothing more than a superficial analysis[.]" *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). As such, an ALJ cannot simply state that an individual's allegations have been considered or that the individual's allegations are not credible. Rather, the ALJ must "give[] specific reasons for [a credibility] finding, supported by substantial evidence." *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009).

The process for evaluating a claimant's symptoms is organized around two major steps. First, the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be

---

[3]  SSR 96-7p referred to a claimant's "credibility," but SSR 16-3p removed that term in order to "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p, 2016 WL 1119029, at * 1 (Mar. 16, 2016). Instead, ALJs are reminded to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that an individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms," as consistent with the regulations. *Id.* Under either SSR version, the outcome of this case would be the same.

expected to produce the alleged symptoms. *See* 20 C.F.R. § 404.1529(a)-(b). Second, after the claimant satisfies the first step, the ALJ must then evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. *See* 20 C.F.R. § 404.1529(c). In evaluating allegations of pain, adjudicators are directed to consider whether the symptoms are "consistent with the objective medical [evidence] and other evidence in the individual's record." SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16, 2016). *See also* 20 C.F.R. § 404.1529(a)(explaining that the agency considers both "objective medical evidence and other evidence" in evaluating whether an impairment affects activities of daily living and the ability to work).

Objective medical evidence is merely one factor to be considered, and an ALJ is not free to "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." SSR 16-3p, 2016 WL 1119029, at *5 (Mar. 16, 2016). Other factors that the ALJ should look at include "daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009)(quoting 20 C.F.R. § 404.1529(c)(2)-(4)). An ALJ may not disregard subjective complaints "solely because they are not substantiated by objective medical evidence." *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015); *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017)(quoting *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)). *See also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004)(stating that "[p]ain is

always subjective in the sense of being experienced in the brain."). "[P]ain alone can be disabling . . . [therefore] [t]estimony of severe pain cannot be disregarded simply because it is not supported by objective medical evidence." *Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016). An ALJ's "failure to adequately explain his or her credibility finding . . . is grounds for reversal." *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015).

In this case, the ALJ found that Plaintiff's "medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28." (TR. 63). Even so, the ALJ concluded: "I find the claimants medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (Tr. 67). Specifically, the ALJ found:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, there is minimal objective evidence in the record that lends support to his claims regarding the severity of his physical health issues. He was diagnosed with transverse myelitis in 2018. He was noted at times to have abnormal gait, and reported at times neurological symptoms such as burning in his feet. He additionally had spinal impairment, plantar bone spurs, and arterial disease which, combined with transverse myelitis, would also warrant the reduction to sedentary work. However, there is no evidence of any complications or worsening of his condition, as his appointments often demonstrate he had normal ranges of motion, and his symptoms remained mostly unchanged throughout the record. His neurologist often noted he was doing well, and much of his imaging revealed mild findings. Looking at the medical evidence, the objective findings in this case fail to provide strong support for the claimant's allegations pertaining to the severity of his symptoms and limitations. Accordingly, I have accounted for the claimant's transverse myelitis of the thoracic spine, mild cervical spondylosis, mild degenerative disc disease and degenerative joint disease of the thoracic spine, mild degenerative disc disease and facet arthropathy of the lumbar spine, bilateral calcaneal bone spurs, and moderate arterial disease of the posterior

> tibial artery in the exertional, postural, and environmental limitations contained in the residual functional capacity."

(Tr. 67).

Here, the ALJ's subjective symptom analysis provides no connection between Plaintiff's symptom testimony and the objective medical evidence to support her conclusion discounting Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms. The ALJ recited medical evidence that may fit into the Section 1529 categories listed above but failed to discuss all the factors clearly. *See* (Tr. 331-333, 344, 351, 353, 367, 374, 378, 443, 451, 455, 472, 492). The ALJ is not specific about why she did not fully credit Plaintiff's testimony concerning his abilities/inabilities to stand and sit due to pain or his daily limitations regarding bending, lifting, and walking. Instead, the ALJ relies on boilerplate language regarding the treatment and medical records not supporting the limitations described by Plaintiff without explaining why the records contradict his statements regarding his constant pain, the inability to stand or sit, inability to walk long distances, and the need for daily naps. *See, e.g., Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)(noting that "[s]uch boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible.") (internal citation and quotation marks omitted).

The record contains several limitations on how Plaintiff performed his daily activities. For example, Plaintiff, reported that he spends most of the day sitting/reclining, then standing and moving positions to get relief from the pain. (Tr. 93-

97, 103-104). Plaintiff did report being able to wash dishes, load the top of the dishwasher, go to the grocery store, and sweep the kitchen (Tr. 97-98, 100. 101). However, Plaintiff clarified that he needed help from his family to complete his chores, that he leaned on the counter while sweeping the floor, that his daughters loaded the bottom of the dishwasher, that his daughters helped him at the grocery store, and that he needed to rest while grocery shopping. (Tr. 97-98, 101, 103). He also stated that he could not carry anything up or down the stairs. (Tr. 101). Further, the record revealed that Plaintiff did not shop alone because of the inability to lift things from the ground, the fear of falling, and the inability to walk for an extended period. (Tr. 97-99, 100, 102-103). The ALJ's discussion did not examine the portions of the record which demonstrated that Plaintiff took many breaks from his "light chores," that he was unable to sit/stand regularly throughout the day without changing positions, that he napped daily, and that he needed assistance during the day due to his symptoms. Further, there is no evidence in the record of malingering or symptoms of magnification. In fact, the record reflects that Dr. Sherwood, who physically examined/treated Plaintiff, noted his many complaints and symptoms, *i.e.*, muscle spasms, sensory deficits, and motor disruption. As such, the Court finds that the ALJ erred in the manner in which she considered Plaintiff's subjective factors.[4]

The ALJ's error requires remand. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v.*

---

[4] As the Court finds that the ALJ committed error regarding Plaintiff's complaints and symptoms which requires remand, the Court need not address Plaintiff's other two arguments.

*Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (internal citation omitted).

This Memorandum & Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## CONCLUSION

The Commissioner's final decision denying Plaintiff's application for disability benefits and supplemental security income is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: August 26, 2022.**

Digitally signed by Judge Sison 2
Date: 2022.08.26 12:26:52 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**